UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN BARNES,

               Plaintiff,                     CASE NO. 03-CV-72229

-vs-                                   PAUL D. BORMAN
                                   UNITED STATES DISTRICT JUDGE

FEDERAL EXPRESS CORP.,

               Defendant.

_____/

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      Before the Court is Defendant's May 1, 2006 Motion for Summary Judgment. (Docket

No. 47). Plaintiff filed her Response on December 7, 2006. (Docket No. 65). Defendant filed its

Reply on December 13, 2006. (Docket No. 67). The Court held a motion hearing on January 11,

2007. Having considered the entire record, and for the reasons that follow, the Court GRANTS

Defendant's Motion for Summary Judgment.

I.      **BACKGROUND**

     A.      **Plaintiff's Factual Allegations**

      This case arises out of alleged acts of race discrimination and retaliation by Federal

Express Corporation ("Defendant") against Plaintiff Susan Barnes ("Plaintiff"). Plaintiff filed

suit on June 10, 2003, alleging the following Counts: (I) Title VII; (II) 42 U.S.C. § 1981; and

(III) the Elliot Larsen Civil Rights Act under Michigan law. The Court dismissed Counts II and

III on March 31, 2005. (Docket No. 22).

Plaintiff claims Title VII discrimination and retaliation arising out of her employment at Defendant between 1997 and 2002. Plaintiff asserts that she was discriminated against by three supervisors, two white and one black. Plaintiff was terminated from her employment on two occasions, in September 2000 and March 2002. She was reinstated both times after internal appeals. Plaintiff was ultimately terminated from her employment in December 2002.

Plaintiff was initially hired by Defendant in May 1997 as a part-time courier at its office in Southfield, Michigan. Plaintiff claims that Craig Cappel, a white male who was her manager during 1997 and 1998, discriminated against her. However, in her deposition testimony, Plaintiff only offers one example where Cappel berated her. While she was training as a courier, Plaintiff maintains that when she returned late with a driver from a route on her training, Cappel yelled at Plaintiff, and not the driver, for her tardiness. When asked why she felt he did this, Plaintiff explained that it was "because I was low key and I didn't yell and I didn't get up in his face" and "because I was only there to observe." (Dep. Barnes 19:10-22).

Plaintiff testified that she was "too scared" to raise any internal or external complaints against Cappel of racial discrimination. At the same time, she did complain to other managers "at his level," apparently about other employment issues. (Dep. Barnes 18:12-18; 19:2-9). The only discipline that Plaintiff received from Cappel was for her attendance. (Dep. Barnes 18:22-23).

In August 1998, Plaintiff accepted another position at Defendant as a part-time courier in Romulus, Michigan. At the Romulus facility, Plaintiff's supervisor was Susan Fortais. (Dep. Barnes 23:8-12; Def. S.J. Ex. E-4, Offer Letter from Susan Fortais). Plaintiff admits that Fortais did not engage in any discriminatory conduct. (Dep. Barnes 23:13-15; Pl. Resp. 2).

2

On January 13, 2000, Plaintiff received a Counseling Letter from Fortais indicating that

Plaintiff was in violation of company attendance policies. (Def. Mot. Summ. J. Ex. E-8,

Counseling Letter from Susan Fortais). On March 21, 2000, Plaintiff received a Performance

Letter from Fortais that informed Plaintiff that she had eleven (11) absences in the past nine (9)

months. (Dep. Barnes 59:1-25; Def. S.J. Ex. E-8, Performance Letter from Susan Fortais). The

Letter stated that Plaintiff's absences had given her a 2 out of 7 on her Performance Review.

(*Id*.). The Letter also indicated that Plaintiff would not be able to apply for a job change within

six (6) months of reception of the letter. (*Id*.).

In March 2000, Plaintiff accepted a new position with Defendant as a Senior Customer

Service Agent in Novi, Michigan. (Dep. Barnes 25:6-9; Def. Mot. Summ. J. Ex. E-4, Offer

Letter from Michael Anderson). White female Christine McAllen was Plaintiff's supervisor from

March to June 2000. Black female Jeanette Cooper was Plaintiff's supervisor from June 2000 to

September 2002.

Under McAllen, Plaintiff testified that she and another black employee, Kim Coleman,

were treated differently than white employees in regards to schedules, requesting days off,

working hours, and leaving employees to work alone on a shift. (Dep. Barnes 142:19-25; 143:1-

4). Plaintiff stated that one white employee, Nedra Blaxton, was accommodated with a schedule

shift in order take her grandchildren to school. (Dep. Barnes 143:10-25; 144:1-24). Plaintiff also

stated that McAllen put her and the other black employee on the more demanding night shift,

while the white workers had easier day shifts. (Dep. Barnes 31:2-17). Plaintiff testified that

approached McAllen about the fact that she was more attentive to the problems of white

employees. (Dep. Barnes 28:20-25; 29:1-24). Plaintiff also complained to Cooper, another manager, about McAllen. (Dep. Barnes 30:6-25).

After Cooper replaced McAllen as Plaintiff's manager, Plaintiff testified that Cooper was told her that she was going to "toughen her up," gave her worse hours, and did not do the same to white employees. (Dep. Barnes 34:6-10). Cooper further singled out Plaintiff by embarrassing her in front of customers to the point of tears, yelling at her over the intercom, and not respecting her workmen's compensation weight-lifting restrictions. (Dep. Barnes 34:11-24). Plaintiff claimed that she did not receive the same training as the white employees, was left out of customer service agent ("CSA") meetings, and was excluded from Cooper's social gifts to other employees. (Dep. Barnes 128:3-25, 129:1-7).

Furthermore, Plaintiff believes that it was a racial, and not a personal issue, between Cooper and her. Plaintiff stated that Cooper did not yell at or embarrass white employees; instead she talked with the white employees in an office. (Dep. Barnes 35:12-25, 127:3-9). Plaintiff also perceived that Cooper spoke in a disparaging manner to other blacks in the company and felt like "she could say anything and do anything because we were the same race." (Dep. Barnes 36:2-8). On one occasion, Plaintiff overheard Cooper say "Nigga" to an unidentified individual on the telephone. (Dep. Barnes 36:11-20). Other than that telephone conversation, Plaintiff could not produce any other evidence that Cooper had negative feelings towards blacks, or Plaintiff, because she was black. (Dep. Barnes 38:15-22).

Fellow co-worker Kim Coleman testified that Cooper would frequently use racial slurs in reference to blacks, but not towards whites. (Dep. Coleman 21:1-22). Coleman stated that she discussed the situation with Jerome Cade, another manager. (Dep. Coleman 21:23-25). Coleman

recounted another incident where an employee informed her that an unnamed manager had referred to black co-workers as "monkeys" in 1999. (Dep. Coleman 22:14-22).[1] Coleman similarly did not take action in regards to racial slurs because of what happened to Plaintiff and since Plaintiff's complaints were "swept under the carpet." (Dep. Coleman 67:10-25, 68:1-3). Coleman testified that Cooper gave white employees higher marks on their performance reviews and complained about that fact to Cade. (Dep. Coleman 76:3-16). Coleman recounted an incident where Cooper caught her and several other employees, including Plaintiff, out of uniform. Cooper then only belittled Coleman and Plaintiff at the counter and not the white employees. (Dep. Coleman 29:17-25, 30:1-19).

Plaintiff also claims that she had been refused promotions. (Dep. Barnes 125:9-20). Plaintiff stated that Cooper had told her to "shut up" several times in front of co-workers and would make negative comments about her hair that she did not make to white employees. (Dep. Barnes 146-48). Plaintiff testified that she did not receive certain training that was given to white employees, but did not complain about it because of intimidation. (Dep. Barnes 128:6-25, 129:1-25, 130:1-11).

Plaintiff was terminated from her position in September 2000 for failure to comply with Acceptable Conduct Policy 2-5, for falsification of an expense report. (Dep. Barnes 94:2-6). Plaintiff had taken a trip to Chicago for CSA training and submitted an expense report for a limousine ride and a meal. (Dep. Barnes 102:3-9, 103:6-10). Plaintiff admitted that she did not put down the correct amount charged by the limousine driver and "guessed at the amount." (Dep.

---

[1] Plaintiff also attaches as exhibits an EEOC Charge of Discrimination filed on January 11, 2002, by Charles Dunn, Jr., and an Employee Information Form by Terry A. Kincannon, as evidence that other employees reported racial slurs made by Defendant's employees. (Pl. Resp. Exs. D, E). Neither document from its face states that the alleged incidents occurred at the Novi location.

Barnes 101:7-10). Plaintiff was aware at that time that falsification of an expense report was a serious offense. (Dep. Barnes 96:14-19).

Plaintiff filed an in-house grievance complaint regarding her September 2000 termination. (Dep. Barnes 57:14-25, 58:1-8). Around that time, Plaintiff also filed an internal EEO claim against McAllen. (Dep. Barnes 99:19-25, 100:1-25). Coleman testified that another white employee, Norma Zara, also had a discrepancy in her expense report; but Defendant provided her the option of taking the money out of her paycheck or bringing in the money. (Dep. Coleman 25:13-21). In an unrelated incident to the expense report investigation, Coleman was accused of stealing money from a briefcase that a customer had left at the station and suspended for a week. Coleman testified that at the same time, Zara had misplaced a package worth $50,000 and had nothing happen to her. (Dep. Coleman 73: 3-17).

At Step II of the grievance process, Vice President Matthew Thornton informed Plaintiff that he was reinstating her to her former position without backpay and with a warning letter. (Dep. Barnes 97:1-11, Def. Mot. Summ. J. Ex. E-15, Letter from Matthew Thornton).

Plaintiff had a conversation in February 2002 with her Human Resources Representative, Elmer Mo Hoffman, about her work schedule and Cooper's yelling and talking "badly" about Plaintiff in front of other people. (Dep. Barnes 45:8-21). Plaintiff did not discuss the fact that she believed that Cooper was discriminating against her on the basis of race. (Dep. Hoffman 22:12-15; 95:17-21). Plaintiff did not request that Hoffman keep their conversation confidential. (Dep. Barnes 46:4-8). Plaintiff knew that Hoffman would tell Cooper. (Dep. Barnes 48:4-12). At that time, Plaintiff also did not give names of any witnesses to Cooper's conduct to Hoffman. (Dep. Barnes 46:12-14). Coleman testified that when Cooper learned that Plaintiff had complained to

6

Hoffman, Coleman overheard Cooper tell Plaintiff that she would "deal with her later." (Dep. Coleman 34:5-25).

In June 2002, Plaintiff's direct manager, Cade, would not give her requested days off to attend a Jehovah's Witness Assembly. (Dep. Barnes 70:2-11; 71:6-7). When Plaintiff appealed the issue to Cooper, Cooper allowed Plaintiff to take the time off that was requested. (Dep. Barnes 71:4-17).

Plaintiff was terminated on a second occasion, this time in connection with an internal investigation of Defendant involving its "Finders Keepers" program. Finders Keepers was a program at Defendant where employees received commissions for obtaining leads for potential new customers who needed to automate their shipping. (Dep. Cooper 22:16-21). CSAs were encouraged to submit "leads" which involved a signed form for each lead verifying that the CSA had a "face-to-face" contact with the lead. (Dep. Hoffman 60:25; 61:1-2).

Defendant's Memphis Home Office launched an investigation since certain employees were receiving unusually large commission checks from the Finders Keepers program. (Dep. Hoffman 33:7-13).

Plaintiff had an unusually high number of leads and commission checks that caused Defendant to investigate her further, along with two other CSAs at the Novi station. (Dep. Hoffman 38:8-19). Holly Bell, a manager in Memphis, requested that Kevin Talley, the district security manager, conduct an investigation of Plaintiff's district. (Dep. Cooper 25:12-22). Bell submitted a memorandum to Cooper, requesting that management audit a random sampling of Plaintiff's leads due to her abnormally large commission payouts. (Def. Supp. Summ. J. Ex. A,

7

Affidavit of Kevin Talley ¶ 1). Cooper did not participate in the investigation, and Talley did not discuss the investigation with Cooper. (Dep. Cooper 44:5-21).

During the course of the investigation, Plaintiff's manager, Latonia Smith, at the direction of Kevin Talley, called a number of customers that Plaintiff had noted as potential leads. In numerous cases, the individuals, whom Plaintiff had submitted as "leads," stated that they had never been contacted by anyone at Defendant. (Def. Mot. Summ. J. Ex. H, Email from Elmer Hoffman; Dep. Hoffman 61:1-9; Ex. E. ¶ 22, Declaration of Paula Cates).

Plaintiff counters that fellow white co-worker Sue Junkulis filed the Finders Keepers request in the same way, but Junkulis was not disciplined. (Dep. Barnes 109:9-25, 110:1-8). Plaintiff admitted that she did not know if Junkulis ever submitted a Finders Keepers request for someone with whom she did not conduct a face-to-face interview. (Dep. Barnes 110:16-20). Coleman testified that Junkulis trained her on the Finders Keepers system. (Dep. Coleman 38:3-9). Coleman additionally stated that she did not observe Junkulis, Blaxton, or Enriquez ever providing identification of any potential leads – the lack of which was the basis for Defendant's investigation of Plaintiff. (Dep. Coleman 38:10-25, 39:1-12).

As a result of the investigation, Plaintiff was again terminated from her employment in March 2002. (Def. Mot. Summ. J. Ex. H). Plaintiff was the only employee terminated at the Novi station as a result of the investigation. (Dep. Barnes 111:17-21; Dep. Coleman 51:25, 52:1-7).

Plaintiff filed another internal grievance complaint regarding her termination. In her grievance, she included an internal EEO document complaining of race and religious discrimination. (Dep. Hoffman 52:3-19). Matthew Thornton reinstated Plaintiff to her former

position with a warning letter and a one-week suspension without pay. (Dep. Barnes 60:21-25; Def. S.J. Ex. E-8, May 1, 2002 Letter from Matthew Thornton).

Plaintiff returned to work in May 2002. Plaintiff stated that she returned to a "hostile work environment," where she did not have her key, was not entered into the computer, and was left on a Saturday morning by herself with no way to do her job. (Dep. Barnes 64:21-25, 65:1-4). After returning to work for approximately one month, Plaintiff took short-term disability leave of absence on June 12, 2002. (Dep. Barnes 89:1-3).

The Benefits Review Committee concluded on October 23, 2002, that Plaintiff was no longer disabled within the meaning of the short term disability policy and ordered her to return to work by September 27, 2002, in her former position. (Def. Mot. Summ. J. Ex. G, Declaration of Michael Gattuso; Dep. Barnes 76:10-17).

Plaintiff instead requested a personal leave of absence. (Dep. Barnes 76:10-17; Def. Mot. Summ. J. Ex. G ¶ 8). Pursuant to Defendant's policy, Plaintiff understood that she had ninety (90) days to apply for and compete for positions for which she was qualified. (Dep. Barnes 77:1-8). Plaintiff further understood that if she did not obtain a position within that period, her employment would be terminated.

During the personal leave period, Defendant periodically sent Plaintiff a printout of jobs available nationwide at Defendant. (Dep. Barnes 77:11-12, 85:13-22; Def. S.J. Ex. G ¶ 9). Plaintiff was offered a part-time position as an Operations Agent by Gattuso on December 13, 2002. Plaintiff refused the job, stating that her doctor had not released her, there were pay and hours cuts, and the position was further away from her residence. (Dep. Barnes 86:4-20).

Plaintiff was terminated on December 22, 2002, in accordance with Defendant's Leave of Absence Policy. (Dep. Barnes 88:16-25). Plaintiff's position was not filled or eliminated by December 22, 2002; and the existing agents assumed Plaintiff's duties. (Dep. Coleman 60:5-25, 61:1-25, 62:1-25; Def. Mot. Summ. J. Ex. F, Declaration of Susan Junkulis ¶ 4).

On December 30, 2002, Plaintiff filed a third grievance complaint. (Dep. Barnes 90:1-5). Management upheld her termination at Step II of the grievance process. (Dep. Barnes 93:12-15). Plaintiff appealed to Step III, and the decision was upheld. (Dep. Barnes 94:22-24). Plaintiff never informed Defendant or its employees in her grievance complaint over the December 2002 termination that she believed that Defendant was either retaliating or discriminating against her on the basis of race. (Dep. Barnes 94:22-24).

### 3.    EEOC Complaint

Plaintiff filed an EEOC Charge of Discrimination on April 3, 2002, after her March 2002 termination. (Def. Reply Ex. 1, EEOC Charge of Discrimination). On January 27, 2003, Plaintiff requested a withdrawal of the Charge and requested a Right to Sue Letter. (*Id.*). At no time did Plaintiff request to amend her Charge. Plaintiff received her Notice of Right to Sue based on that April 3, 2002 Charge on March 12, 2003. (Compl. ¶ 14, Ex. 1, Notice of Right to Sue).

### 4.    Defendant's Arguments

Defendant argues that (1) Plaintiff cannot bring a Title VII claim that exceeds the scope of her EEOC Charge; (2) Plaintiff cannot make a *prima facie* case for discrimination; (3) even if Plaintiff can establish a *prima facie* case, she cannot meet her burden of establishing that Defendant's stated non-discriminatory reasons for her termination were merely pretext; (4)

Plaintiff cannot establish a Title VII retaliation claim as a matter of law; and (5) Plaintiff cannot

demonstrate actionable racial harassment.

## II.       ANALYSIS

### A.       Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim,

counterclaim, or cross-claim is asserted may "at any time, move with or without supporting

affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV.

P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no

genuine issue of material fact as to the existence of an essential element of the nonmoving

party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the
> district court of the basis for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file, together with the
> affidavits, if any," which it believes demonstrate the absence of a genuine issue of
> material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that

fact "would have [the] effect of establishing or refuting one of the essential elements of a cause

of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute

over a material fact is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine

issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## B.    EEOC Charge

Defendant argues that the Court lacks subject matter jurisdiction over Plaintiff's claims because her April 3, 2002 EEOC Charge of Discrimination only mentions her second termination in March 2002. Defendant contends that Plaintiff's EEOC Charge was very specific to a single discriminatory occurrence:

> I was discharged because [Defendant] believed that I did not see a customer who [sic] I claimed to have seen. I deny having violated this policy. However, I know of White employees who have committed the same policy violation I was accused of having committed, but they were not discharged.

12

(Def. Reply Ex. 1).

According to Defendant, nothing in the Charge mentions any racial harassment, retaliation, or any activity prior to March 2002. Plaintiff also never filed a subsequent Charge nor amended the original Charge. On January 27, 2003, Plaintiff requested a withdrawal of the EEOC Charge and received a Right to Sue Letter dated March 12, 2003. (Compl. Ex. 1).

Defendant argues that Plaintiff's pre-2002 allegations do not "grow out of" the 2002 EEOC Charge. Similarly, Defendant contends that the pre-2002 claims should be dismissed since the discrete acts giving rise to the discrimination claim occurred over 300 days prior to the filing of the EEOC Charge. According to Defendant, the "continuing violation" doctrine does not apply to Plaintiff because she is seeking relief for "discrete acts of discrimination and retaliation." Finally, Defendant requests that the Court dismiss Plaintiff's claims as they relates to the December 2002 termination since she never filed an EEOC Charge and 300 days have elapsed.

Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant files the claim in an EEOC Charge or the claim can "reasonably expected to grow out of" the EEOC Charge. *Strouss v. Michigan Dep't of Corrs.*, 250 F.3d 336, 342 (6th Cir. 2001). Further, under the "extended scope of investigation test," the Sixth Circuit has held that "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (quotations omitted). "[A] broad reading of the charge is necessary where Title VII claimants are unschooled in the technicalities of the law and

proceed without counsel." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir. 1999) (internal quotations and citation omitted).

Plaintiff's April 2002 EEOC Charge clearly refers to alleged discrimination in connection with the Finders Keepers investigation. Defendant claims that Plaintiff provides no reason why the facts in that charged claim would have prompted the EEOC to investigate the pre-2002 alleged incidents involving Cappel, McAllen, or Cooper. *See Doan v. NSK Corp.*, 266 F. Supp. 2d 629, 636 (E.D. Mich. 2003). Additionally, Plaintiff's Charge specifies a discrete instance of discrimination and does not allege any kind of factual allegations of a "continuing action" or retaliation, over a period of time. Plaintiff never amended her Charge and subsequently requested a withdrawal on January 27, 2003.

Defendant also argues that Plaintiff's December 2002 termination claim is barred since Plaintiff did not file an EEOC Charge in relation to those events. Plaintiff does not offer any explanation how the March 2002 Charge would have prompted the EEOC to investigate her termination in connection with her failure to accept another position at Defendant at the end of her ninety-day (90) personal leave.

The Court finds that it is reasonable that Plaintiff's April 2002 Charge would have prompted the EEOC to investigate antecedent facts of alleged discrimination involving Cappel, McAllen, and Cooper, as they may have beared upon her March 2002 termination. However, the Charge is insufficient to have put the EEOC on notice concerning the December 2002 termination. The circumstances of Plaintiff's ultimate termination differ considerably in terms of facts and individuals involved. Since Plaintiff chose to withdraw her Charge, rather than amending it, and requested a Right to Sue Letter, and since 300 days have passed from the date

14

of the incident, the claims involving Plaintiff's December 2002 termination are not properly before the Court. *See* 42 U.S.C. § 2000e-5(e).

Accordingly, this reasoning provides a ground for the Court to grant Defendant's Motion for Summary Judgment as it pertains to Plaintiff's claims arising out of her December 2002 termination.

Even if the Court were to find that Plaintiff has fully complied with her EEOC obligations in respect to the December 2002 termination, and all of the facts and claims that she alleges are properly before the Court, Plaintiff's case still cannot survive summary judgment.

### C.   Employment Discrimination Claim

Defendant argues that Plaintiff cannot establish a *prima facie* case of discrimination under Title VII under the third and fourth prongs of the *McDonnell-Douglas* test. In order to create a presumption of employment discrimination, a plaintiff must establish by a preponderance of the evidence that (1) she was a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the job; and (4) for the same or similar conduct, she was treated differently from similarly situated non-minority employees, or that she was replaced by a person outside of her protected class. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 609-10 (6th Cir. 2002).

If a plaintiff sustains her burden of establishing a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for her termination. *McClain v. NorthWest Cmty. Corrs. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006). If the defendant successfully carries its burden, the burden returns to the plaintiff to produce evidence from which a jury could find that defendant's stated reason for termination was merely

15

pretextual. *Id*. (citation omitted). The plaintiff may demonstrate pretext by showing that

defendant's articulated reasons (1) had no basis in fact, (2) did not actually motivate the adverse

action taken against her, or (3) were insufficient to motivate the adverse action taken against her.

*Id*. (quotation and citation omitted). It is well settled that mere personal beliefs, conjecture, and

speculation are insufficient to support an inference of discrimination. *Grizzell v. City of*

*Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (citation and quotation omitted).

Defendant contends that Plaintiff cannot establish the fourth prong of the *prima facie*

case requirement. Defendant states that Plaintiff has not produced evidence that demonstrates

that she was treated differently from similarly-situated non-minority employees, or that she was

replaced by someone outside of her protected class.

### 1.    December 2002 Termination

Defendant maintains that Plaintiff simply failed to apply for another position at

Defendant during her ninety-day (90) personal leave of absence, pursuant to company policy.

Plaintiff took short-term disability leave on June 12, 2002. On October 23, 2002, the Benefits

Review Committee informed Plaintiff that she was no longer disabled for the purposes of short-

term disability based upon information supplied by Plaintiff's physicians. Defendant notified

Plaintiff that she could either return to her position as a Senior Service Agent or take a personal

leave, during which time she could apply for another position with the company. Plaintiff turned

down Defendant's offer to return to her Senior Service Agent job at the conclusion of her short-

term disability. Plaintiff also failed to apply for any open positions at Defendant during the

entirety of her personal leave period. Pursuant to company policy, Defendant finally terminated

Plaintiff on December 22, 2002.

Plaintiff argues in relation to the December 22, 2002 termination that although the company doctors cleared Plaintiff to return to work in October 2002, Plaintiff's personal physician did not agree with that assessment at the time. (Pl. Resp. 9). Plaintiff has not produced any evidence supporting this assertion. Plaintiff further claims that she did not return from disability due to a "hostile work environment." (*Id*.). However, Plaintiff does not allege a hostile work environment claim in her Complaint or in her brief.

The Court finds that there is no indication in the record that Plaintiff was treated differently from non-protected employees as it relates to her sick leave, her personal leave, and failure to reapply for a position with the company. Furthermore, both parties seem to agree that Plaintiff's position was subsequently covered by existing employees. (Dep. Coleman 60:5-25, 61:1-25, 62:1-25; Def. S.J. Ex. F, Declaration of Susan Junkulis ¶ 4). The Sixth Circuit has held that an employee is not "replaced" when one or more employees assume the plaintiff's job duties while retaining former job titles and responsibilities. *Godfredson v. Hess & Clark, Inc.*, 173 365, 373 (6th Cir. 1999). Furthermore, as explained below, Plaintiff has not shown how any previous allegations of discrimination or retaliation impacted her December 2002 termination. Therefore, the Court holds that Plaintiff cannot make a *prima facie* case regarding the December 2002 termination.

2.     March 2002 Termination

Even if Plaintiff could make a *prima facie* case in relation to the Finders Keepers termination, Defendant contends that it had legitimate, nondiscriminatory reasons to terminate Plaintiff in March 2002. Plaintiff's contends in response that (1) she was the only person investigated at her particular station; (2) fellow co-worker Junkulis submitted leads in a similar

17

way and had high lead numbers and was not investigated; (3) the investigation only included Plaintiff's leads from January 2002 and February 2002, while Junkulis had the highest totals for fiscal years 2001 and 2002; and (4) only black employees in the district were disciplined or terminated in connection with the investigation.

Plaintiff's second termination occurred as a result of the Finders Keepers program where CSAs were encouraged to submit "leads" for new accounts, where each had to verify that they had face-to-face contact with each lead and a signed form verifying each face-to-face contract. After discovering that certain CSAs throughout the Great Lakes District were receiving abnormally large commission payouts, Defendant, through its Home Office in Memphis, launched an internal investigation of certain CSAs. Plaintiff's supervisor was not involved in this investigation. The inquiry revealed that Plaintiff failed to make any contact, much less face-to-face contact, with her submitted leads for commission payouts. As a result, Plaintiff was terminated. Plaintiff appealed the decision. She was reinstated on May 1, 2002.

Plaintiff submits an Interoffice Memorandum from Kevin Talley detailing the results of the investigation into the Finders Keepers program, to show that only black employees were investigated for the fiscal years 2001 and 2002. (Pl. Resp. Ex. F, Interoffice Memo).[2] Plaintiff argues that while other employees were investigated for the periods of February, June, or October 2001 to January 2002, Defendant only investigated Plaintiff for the months January and February 2002. Plaintiff contends that Sue Junkulis, the CSA with the top payouts for the fiscal years 2001 and 2002, was never investigated.

_____

[2] Nothing in this Exhibit indicates that the subjects under investigation were African-American.

18

The Finders Keepers investigation was launched upon a request of Holly Bell, a manager in Tennessee, who requested that Cooper investigate Plaintiff's abnormally large commission payouts. Defendant also submits unrefuted documentary evidence that Finders Keepers investigation encompassed many individuals suspected of fraudulent leads all over the Great Lakes Region.

Plaintiff was not the only individual at the Novi station to be investigated. Furthermore, Plaintiff admitted that she did not know if Junkulis ever submitted a lead without a face-to-face interview. From the record submitted by both parties, Junkulis was not in the top ten ranking in leads in November 2001, while Plaintiff had 134 "leads" and was in first place in the district by a large margin. (Def. Supp. S.J. Ex. A, A-4 Email from Dan Saville). In January 2002, Plaintiff was in first place in at her station with a $1,165.00 payout, while Junkulis was in second with $398.00. In February 2002, Plaintiff was again in first place with a $1,975.00 payout, while Junkulis was in third with $359.00.

First, Plaintiff has not produced evidence to the Court demonstrating that Junkulis had the highest payouts for fiscal years 2001 and 2002. Second, Plaintiff admitted that she did not know if Junkulis ever violated Defendant's policy of submitting leads without face-to-face interviews. Finally, Plaintiff has not shown that she was specifically targeted in the Finders Keepers investigation on the basis of her race, since many individuals across her region were investigated, including a fellow employee at the Novi station. Accordingly, the Court finds that Plaintiff cannot show that she was treated differently from similarly situated non-minority employees to establish a *prima facie* case concerning the March 2002 termination. In the alternative, Plaintiff has not adequately shown that Defendant's stated reasons for terminating

19

her – the falsification of information in connection with the Program – were merely pretext.

### D.   Retaliation Claim

Defendant argues that Plaintiff cannot establish a retaliation claim arising out of her March 2002 termination since (1) Plaintiff's complaint to Hoffman only involved "yelling at her," and not racial discrimination, thus not protected activity; (2) Plaintiff cannot show a causal connection between her complaint and adverse employment action; and (3) even if there was a causal connection, Defendant still had legitimate, nondiscriminatory reasons for her termination.

In her response, Plaintiff essentially argues that other employees outside her class were not disciplined or terminated in the same manner as Plaintiff for the expense report and Finders Keepers incidents. Plaintiff relies upon *Manzer v. Diamond Shamrock Chems. Co*., 29 F.3d 1078 (6th Cir. 1994), for the proposition that a party can admit the factual basis underlying the employer's proffered reason for dismissal but attempt to indict the credibility of that explanation by bringing forth evidence that employees not within the protected class were not disciplined or fired for substantially identical conduct.

In order to establish a *prima facie* claim of retaliation, the plaintiff must show that (1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected. *Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724, 736 (6th Cir. 2006). In regard to the fourth prong, although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to

support a finding of a causal connection. *Id*. at 737. The Supreme Court has recently held that an adverse employment action is any action that might dissuade "a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Rwy. Co. v. White*, 126 S. Ct. 2405, 2415 (2006).

As an initial matter, Plaintiff's reliance on *Manzer* is not appropriate. The relevant portion of the *Manzer* case discusses the avenues by which a party can challenge the credibility of an employer's explanation of "legitimate, nondiscriminatory" reasons for the discharge. 29 F.3d at 1084. The discussion in *Manzer* is relevant to a race discrimination claim, and not a retaliation claim.

Plaintiff has not put forth any evidence that she complained of discrimination, or otherwise engaged in protected activity, to either Defendant or the EEOC either before or after her September 2000 termination for the expense report. Regarding Cappel, who was Plaintiff's manager in 1997 and 1998, Plaintiff stated that she did not complain about race discrimination to his superiors, but did talk to other managers at his level about other employment issues with him. Plaintiff only offers one instance where Cappel berated her while she was training as a courier. When asked why she felt he did this, Plaintiff explained "because I was low key and I didn't yell and I didn't get up in his face" and "because I was only there to observe." (Dep. Barnes 19:10-22). Additionally, Cappel was no longer her supervisor when Plaintiff was terminated for the expense report incident in September 2000. Therefore, Plaintiff has not shown any causal connection between protected activity and any adverse action.

Concerning McAllen, Plaintiff's subsequent supervisor from March to June 2000, Plaintiff similarly provides no "indicia of retaliatory conduct" that McAllen retaliated against her

21

for making complaints. Plaintiff testified that she complained of her belief that McAllen was treating her different because of race to McAllen herself as well as to Cooper. Here, Plaintiff similarly does not show any causal connection between those complaints and any materially adverse employment action taken against her.

Plaintiff has likewise failed to show a causal link between protected conduct and materially adverse employment action in connection with her complaints to Hoffman about supervisor Cooper. Plaintiff only offers her own personal beliefs that Cooper's statement that she would "deal with [Plaintiff] later" after discovering the complaints to Hoffman support that Cooper retaliated against her. This statement, without anything more, does not provide Plaintiff's suggested retaliatory motive. Moreover, Plaintiff offers no evidence that Cooper had anything to do with the Finders Keepers investigation or was in any way responsible for her March 2002 termination.

Furthermore, Plaintiff has not shown how engaging in protected activity, filing (1) the March 12, 2002 EEOC complaint and (2) the internal EEO complaints to Hoffman arising out of her March 2002 termination, was a motivating factor in her ultimate December 2002 termination. Plaintiff was reinstated to her former position in May 2002 and voluntarily took short-term disability leave in June 2002. Plaintiff's ultimate termination did not occur until December 2002, after she took a personal leave following her short term disability leave. Defendant demonstrated that under company policy, the decision to take a personal leave obligated an employee to reapply for positions in the company, with no guarantee of continued employment. Under that policy, Defendant was not required to secure Plaintiff's previous position in Novi during her personal leave.

Plaintiff states that she did not take an open position because the posted jobs had fewer hours, paid less, and were further away from her residence. Plaintiff also suggests that the reason that she went on short-term disability and then personal leave was because of a "hostile work environment." By her own admissions, Plaintiff claims that she was not satisfied with the company's open positions during that period, and it is undisputed that she refused to apply for any position.

Plaintiff was reinstated to her former position after she filed her EEOC Charge and internal EEO complaint in May 2002. Her ultimate termination occurred over nine (9) months after her EEOC Charge. In sum, there is a lack of evidence giving rise to any reasonable inference that Defendant terminated her in December 2002, in whole or in part, as retaliation for any previous protected activity.

Accordingly, the Court GRANTS summary judgment to Defendant on the retaliation claim.

III.   **CONCLUSION**

For the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment.

**SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 1, 2007

23

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on February 1, 2007.

s/Denise Goodine
Case Manager